UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES                              :

     v.                                   : Crim. No. 24-CR-62 (ABJ)

DONALD ZEPEDA                              :

## **DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

COMES NOW Defendant, Donald Zepeda, through undersigned counsel, Stephen F. Brennwald, Brennwald & Robertson, and submits the following sentencing memorandum to assist the Court in fashioning an appropriate sentence in this case. Specifically, Mr. Zepeda asks this Court to sentence him to a total of one year and a day followed by an appropriate term of supervised release.[1]

### *Procedural Background*

Donald Zepeda was indicted, along co-defendant Jackson Green, in connection with an event that took place at the National Archives in Washington, D.C. on February 14, 2024.

He was arrested on February 29, 2024, brought to court, and then placed in strict home detention, in which status he has remained for the past nearly eight and a half

---

[1] In the plea offer the government made to the defendant, it had agreed to cap its allocution at three years of incarceration. During plea negotiations, the defendant asked the government to allow him to contest the government's calculation and analysis of the loss amount. The government declined, resulting in the defendant's guilty plea without an explicit agreement from the government regarding allocution. Defendant notes, however, that there has been no change in circumstances or facts between the date of the plea offer (which remained open until the very day Mr. Zepeda pled guilty) and the date he entered his guilty plea. It is puzzling, and troubling, that the government, in its sentencing memorandum, increased its demand regarding imprisonment from three to four years given the lack of any change in circumstances and the defendant's admission of guilt and acceptance of responsibility. It is essentially telling Mr. Zepeda that because he did not accept the government's interpretation of the law, it will ask the Court to add one year to his sentence of imprisonment.

months.

The conditions of his release are as follows:

"Participate in home detention location restriction programs and comply with its requirements as directed. You are ***restricted to your residence at all times*** except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court- ordered obligations; or other activities approved in advance by the pretrial services office or supervising officer." ECF Doc. 20, at 1 (emphasis added).

On March 20, 2024, the Court slightly modified Mr. Zepeda's conditions of release. He was still on home detention twenty-four hours a day but was allowed to go to a McDonald's near his house, a nearby library and church, and a grocery store.

On August 13, 2024, he pled guilty to the sole count in the indictment in which he was named, charging him with Destruction of Government Property, in violation of 18 U.S.C. § 1361.

The plea was not the result of a plea agreement.

In connection with his plea, Mr. Zepeda agreed that on February 14, 2024, he had entered the National Archives building in Washington, D.C. along with co-defendant Jackson Green, and while in there, the two had emptied a bag of red paint powder on themselves and on a casing (sometimes called the "encasement") enclosing the United States Constitution. The document itself was completely covered by a double-layered glass structure.

The document itself was not touched or affected in any way. Thus, there was no damage to the document whatsoever. However, the cost of cleaning up the casing and

the floor around it is reported to be $58,607.59.  In addition, the Archives were closed to the public for four days while the floor and the encasement were cleaned.

The Archivist of the United States, Dr. Colleen J. Shogan, noted in her victim impact statement that the building is now subject to a new security protocol to prevent further attacks from happening.

Defendant is not aware of any "copycat" incidents in the United States since this incident on February 14, 2024.  In fact, this incident was a copycat, loosely speaking, of actions undertaken by other climate activists in Europe.

To his credit, Mr. Zepeda was the first defendant to plead guilty to the indictment. Two days after he pled guilty, co-defendant Green pled guilty as well.

Sentencing is scheduled to take place on Friday, November 15, 2024, at 2:30 p.m.

### *Factual Background*

Defendant agrees with the statement of facts presented in paragraph 17 of the presentence report.  It states:

> "On February 14, 2024, defendant Zepeda entered the National Archives in Washington, DC. Defendants Zepeda and Green stood in front of the display case containing the US Constitution and emptied a bag of red paint powder on the case. The powder spread over the case, the floor, and defendant Zepeda's clothes. As defendant Zepeda released the powder, he made a statement explaining his intent in doing so. Defendant Zepeda's conduct was disseminated through social media.

Mr. Zepeda noted in a statement he made after the event that "…if [President Biden declares a climate emergency] …[it] unlocks abilities to advance a lot more clean energy, get more of that funded and invested in, and scale back on fossil fuel[.]". He

added: "Having the declaration also conveys to the public how bad it is."

### *The Sentencing Guidelines*

Defendant adopts, to the extent applicable, the guidelines arguments presented by counsel for Joanna Smith in her sentencing memorandum. *United States v. Joanna Smith*, 23-cr-182-2 (ABJ), ECF Doc. 40, at 9-14.

Mr. Zepeda adopts that argument to the extent applicable because there is at least one significant difference between the two defendants, i.e., the charges to which each pled guilty.

Ms. Smith pleaded guilty to a statute that explicitly references "objects of art or scientific or historical objects on exhibition within the specified buildings or grounds…". 40 U.S.C. §6303(b).

Mr. Zepeda, on the other hand, pled guilty to the "general" destruction of government property statute. 18 U.S.C. §1361.

2.  The government argues that the guideline applicable to Mr. Zepeda's case is found in U.S.S.G. 2B1.5, pursuant to the language in U.S.S.G. 2B1.1(c)(4). That guideline provides that

> "[i]f the offense ***involved*** a cultural heritage resource or a
> paleontological resource, apply §2B1.5 (Theft of, Damage to,
> or Destruction of, Cultural Heritage Resources or Paleontological
> Resources; Unlawful Sale, Purchase, Exchange, Transportation, or
> Receipt of Cultural Heritage Resources or Paleontological Resources),
> if the resulting offense level is greater than that determined above
> (emphasis added).

As far as counsel can determine, the guidelines nowhere define the word

4

"involved," either in this or in any other guideline, application note, or commentary.

In its memorandum, the government references "the few cases construing this [USSG 2B1.5] guideline." ECF Doc. 47, at 23. It then proceeds to cite one case – *United States v. Allen*, 516 F.3d 364 (6th Cir. 2008) - that does not define the word "involved."

The government's reliance on *Allen* is misplaced. *Allen* merely addressed the rather common question whether the defendants' conduct in that case – the attempted theft of rare books – should be punished by calculating the actual loss or the intended loss. The case does reference objects of "cultural heritage," as the books defendants tried to steal were rare, and very valuable.

But the issue was not whether the defendants' actions "involved" those books – they clearly did. They physically took the books from a university library. They were ultimately unable to take four of the books they had intended to steal because of their weight, but the appellate court found that they certainly intended to take those books, in addition to the books they were able to physically remove from the library. Thus, the court found that the loss amount should include the four books the defendants had dropped in the stairway of the building from which they were stolen.

*Allen*, again, does not help the government's case for at least two reasons: First, the issue was not whether "affecting" an encasement of an item of cultural heritage – as Mr. Zepeda did here - "involved" that item of cultural heritage. It was whether the value of the four books that had not been removed from the building (because they were too

heavy to carry) should be included in the loss amount referenced in the "loss table" found in U.S.S.G. 2B1.1(b)(1).  Second, in *Allen*, the defendants actually physically took the objects of cultural heritage.  Thus, their conduct definitely and clearly "involved" those books.

Here, the question is whether touching an encasement (that obviously has a value of its own) and causing the victim (the National Archives/United States government) to have to expend resources to clean that item, as well as the floor around the display "involved" the item within the encasement.

Defendant challenges the government to find a case where any appellate court in this country has resolved this issue in a case where the actual item of cultural heritage was not touched in some way.

There are cases where a defendant threw blood on an object, or otherwise "vandalized" a priceless work of art.  Those actions clearly "involved" the item in question.  Other defendants have hit, attacked (with an object), burned, wet, or otherwise undertaken an action that "involved" an object of cultural significance.

In each of those instances, the item itself, not some item near it (whether that item encased or supported the object but was not originally a part of the culturally significant object) was "affected."

Here, the statute Mr. Zepeda admitted violating requires that a person "injure" or "commit any depredation" against government property.

There can be no argument that Mr. Zepeda "injured" the United States

6

Constitution – even the government and the Archivist of the United States concede that point.

As to the word "depredation," it is defined as "an act of attacking or plundering." Here, Mr. Zepeda did not "attack" the Constitution. Nor did he "plunder it." "Plunder" is defined as a taking or removing an object, often by force.

Here, Mr. Zepeda did not "take" the United States Constitution.

That language controls the outcome of the issue in this case.

### *Loss Amount*

Because the defendant's actions did not actually "involve" the United States Constitution in a real sense, the "loss amount" should be calculated by the damage to the encasement, not to the item inside.

If Mr. Zepeda has destroyed, burned, smeared, wet, or otherwise touched the document, there would be no question that his actions "involved" an item of cultural heritage.

But the statute was not intended to punish those who did not, in reality, damage or harm the item in question. It was meant to protect valuable items, not plexiglass or other items that have only a "non-historic" value.

There is no question that the encasement used here is not a typical encasement, as it has two layers of glass with some other substance in between. But while it may be worth more than $1,000, and possibly more than $5,000, the encasement is not, as far as defendant is aware, over 100 years old. And it is certainly not, itself, an object of cultural

heritage.  *See* 18 U.S.C. 668(a)(2).

In fact, construction of the Archives building did not begin until 1933 – 91 years ago.  There is no evidence that the encasement that Mr. Zepeda affected was in existence and covering the Constitution prior to the beginning of the building's construction.

Mr. Zepeda (through counsel, as Mr. Zepeda has no knowledge whatsoever of the intricacies of the relevant statutes and guidelines) does not mean, in any way, to trivialize the significance of his actions, or the impact they had on many people.

His counsel, however, must analyze all of the moving parts, and make legal arguments (as to the "loss" issue) based on reality and logic, unaffected by the emotions his conduct has created.

Here, as viscerally infuriating as the conduct may be, it is simply not the case that Mr. Zepeda's actions "involved" the United States Constitution except in an overly broad sense.  There is no question that, philosophically, Mr. Zepeda and others "chose the scene" in question to emphasize the vital importance of their struggle for climate action. But that does not inevitably lead to the legal conclusion that their action "involved," in a statutory sense, the Constitution itself.

Counsel is aware that this Court, in the Joanna Smith matter, stated that it found this to be a "distinction without a difference…"  *United States v. Joanna Smith*, 23-cr-182-2, sentencing transcript at 9.

Respectfully, defendant disagrees because although an item of great cultural significance was contained within the glass encasement on which the pink powder fell,

defendant did not injure the item within, nor did he even *intend* to injure the item within.

Defendant could have chosen to throw powder on a statue within the Capitol, or on any item that is exposed to the public and is culturally significant. But he purposefully did not undertake an action that he knew would harm such an object. He did not try to break the glass case so he could access the document within. He did not break the case and damage the historical document. He put powder on a case that he knew was protecting the item within. He never intended to, nor did he, harm the Constitution itself. And that case had not enveloped the Constitution from the beginning, or been a part of it whatsoever. It was a protective structure designed to keep it safe from harm, whether by burning, staining, wetting, tearing, or other means.

Thus, the guideline analysis in this case is different than the analysis this Court performed in Joanna Smith's case. First, as noted earlier, she pled to a different statute – a statute that the Court found very relevant to the guideline calculation. Second, as this Court recognized at her sentencing, the glass case in which the Degas statue was displayed had enclosed and been "part and parcel of" the statue since the beginning in 1881. *Id.* at 11-12.

That cannot be said of the case enclosing the Constitution. It was not one part of a multi-part exhibit. It was not even an "appendage." It was a means of keeping the actual item of cultural value safe from harm.

Mr. Zepeda certainly did not expect that his actions would lead to the expenditures they did. Rather, he thought that the powder could be wiped off of the glass and swept or

vacuumed off the floor.

As acknowledged above, other climate or civil rights activists have undertaken actions that directly "involved" an item of cultural significance over the years. *See* https://en.wikipedia.org/wiki/List_of_destroyed_heritage. Those actions all involved either burning, flooding, smashing, or otherwise damaging actual items of cultural significance.

If one extends the logic of concluding that an encasement "involves" an item of cultural heritage within it, one could argue that an entire room where a statue or other object was displayed "involved" that item as well. That conclusion is obviously far-fetched, but it highlights the danger of reading the language of the statute and of the guidelines too broadly.

It was not the intent of the drafters of the statute, defendant argues, to bring within its reach various related but non-culturally significant items such as an encasement.

The fact that the parties are vigorously disputing this guideline application, as well as the fact that not a single appellate case has apparently addressed this issue of the meaning and application of the word "involved," demonstrates that the language of the statute is ambiguous and vague.

And, as this Court knows, a criminal statute whose meaning is uncertain should be construed narrowly, rather than expansively. The rule of lenity also so dictates.

For that reason, defendant submits that the loss amount is as he calculated in his submission to this Court in ECF Doc. 37, at 4.

*Analysis of Sentencing Factors Pursuant to 18 U.S.C. §3553(a)*

As this Court knows, pursuant to the *United States v. Booker*, 543 U.S. 220 (2005) and *Gall v. United States*, 128 S.Ct. 586, 596-97 (2007), not only are the United States Sentencing Guidelines no longer mandatory, but they are also not even presumptively reasonable.

As delineated in the statute, the sentence imposed must:

1) reflect the seriousness of the crime;

2) promote respect for the law;

3) provide just punishment;

4) deter criminal conduct;

5) protect the public from further crimes, and

6) provide the Defendant with any necessary educational or vocational training, medical care, or other correctional treatment.

In addition, this Court must also consider:

1) the nature and circumstances of the offense;

2) the history and characteristics of the defendant;

3) the kinds of sentences available;

4) the sentencing range;

5) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and

11

6) the need to provide restitution to any victims of the offense.

***The Proposed Sentence of One Year and a Day Would Reflect the Seriousness of the Crime, Promote Respect for the Law, Provide Just Punishment, Deter Criminal Conduct, both by him and by Others, and Protect the Public from Further Crimes***

As noted above, defendant asks this Court to impose a sentence of one year and a day, along with a period of supervised release.  Defendant also understands that this Court will order him to pay restitution.

The lengthy sentence proposed by Mr. Zepeda would reflect the seriousness the crime as well as deter him from future criminal conduct.  It is true that Mr. Zepeda has engaged in acts of civil disobedience before.  His record reflects that.  But before this case, Mr. Zepeda had never served a sentence of more than 60 days.

Thus, increasing the sentence here to more than six-fold the longest sentence he has ever served would send him a very strong message that even those who do not destroy or harm an object, but who affect its outer casing, will go to jail for a significant period of time.

It would also deter other would-be activists, as a sentence of that length would cause almost anyone to decide that that type of conduct was not worth it given the consequences.

As noted earlier, Mr. Zepeda never thought that his actions on February 14, 2024, would impose such significant costs on the Archives and on those who worked or wanted to visit there.  Counsel speculates that because he is a single male who has lived a very

simple life, he never thought that the powder he and Mr. Green spread would scare anyone or would take more than a few minutes of vacuuming or wiping down to clean up.

He had no idea that it would take so much time and effort to clean the small specs of dried paint off of the encasement. He understands now, having read the victim impact statement, that actions that he viewed as rather benign at the time were viewed completely differently by others who did not know what the pink powder was and/or who had to spend many hours cleaning up the mess he made.

Mr. Zepeda was truly shocked when he learned how extensive the clean-up effort was. It seemed truly impossible to him that what the government claimed in this regard could be true. But he has come to accept that what he intended as a dramatic moment meant to shake the world awake from its climate slumber and stupor turned into something else completely.

It is critically important for this Court to know that Mr. Zepeda is not someone who engaged in these actions to call attention to himself. At all.

There was nothing narcissistic or vain about his actions that day. His actions were not those of someone who is self-righteous. He knew he risked going to jail, but he was also acutely aware of how dangerous the world's extreme failure to sufficiently address climate change has been, and will be, to millions of people around the world. It is those people about whom he was thinking at the time he poured powder on himself and on the glass case.

Most people in this world, frankly, stand by and watch as calamities happen, or wrongs are perpetrated. They either don't care, or they feel powerless to effect change. A few others refuse to remain silent in the face of injustice or impending doom and cry out as prophets in the wilderness.

Mr. Zepeda did not see himself as a "prophet" in the wilderness but he did see himself as someone who witnessed repeated inaction by the vast majority of countries – inaction that climate scientists have regularly warned will lead (and has already led) to horrific consequences for large swaths of the planet and was willing to lose his freedom to try to cause people to wake up and think about the fate of the world if governments, corporations, and people didn't make extremely significant changes very soon.

His goal was not to hurt the Constitution, and he didn't. His goal was to try to get the Biden administration to declare a climate emergency so that vastly greater resources could be committed to the crisis, and executive orders issued.

At this point in his life, however, Mr. Zepeda has confided in counsel that he does not want to get arrested anymore – ever. Thus, he has decided to no longer exceed the boundaries of the law in order to make a point, no matter how urgent and critical that point is. He will work toward climate action in ways that do not involve committing a crime.

The Court, in the Joanna Smith case, expressed its concern that "copycat" actions may have been encouraged by her conduct. *Smith* sentencing transcript, at 45.

Fortunately, that has not happened here.

14

Finally, defendant notes that he has been in home detention for over eight months. While this is not the same as being in prison, it has constituted a very significant restraint on his freedom and should be considered in connection with any sentence the Court imposes.

In light of this, defendant submits that while a sentence of 12 months and a day represents a very long sentence to Mr. Zepeda, it would constitute a sentence that is sufficient, but not greater than necessary, to fulfill the goals of the sentencing statute.

### *The Court's Duty to Provide the Defendant with any Necessary Educational or Vocational Training, Medical Care, or Other Correctional Treatment.*

Mr. Zepeda is 35 years old. To his credit, after attending several schools he finally received a bachelor's degree in international relations in 2017. Despite this, he works in a low-level job at the moment, likely because in light of his impending imprisonment it did not make sense for him to try to find more permanent and significant employment.

He will certainly take advantage of any programs a prison offers, but at this point he is not asking the Court to recommend any particular program.

### *The History and Characteristics of the Defendant*

This Court must also consider the history and characteristics of the defendant when deciding upon an appropriate sentence.

As noted, Mr. Zepeda is 35 years old, with a college education.

Despite that asset, he has spent most of his working years employed at sandwich shops. He did work at an art museum for a period of about 21 months as a gallery

15

security officer.

Despite the under-employed nature of the jobs he has performed, Mr. Zepeda does have a good work ethic, and he will work hard once he is released from jail.

The presentence report notes quite a few arrests, all of which are tied to protest activity.

This case in particular, however, seems to have served as a wake-up call for him, as he faces more time in jail than he has ever faced in his life.  At his age, and with his record of arrests and convictions, Mr. Zepeda has decided to never again commit any act that could remotely result in an arrest.  He is 35, and tired.

It appears that much of his past activities are consistent with the stereotypical actions of young people who see a very worthy cause and care about others to the point that they are willing to take great personal risks to try to make a difference.

And while he still cares very deeply about the environment, and the millions of people who will be displaced, starve, or otherwise suffer as a result of a rapidly-heating planet, he will work within the bounds of the law to effect as much change as possible.

For these reasons, defendant submits that a sentence of 12 months and a day, followed by a period of supervised release, would constitute a sentence that is sufficient, but not greater than necessary, to accomplish the purposes of the federal sentencing statute.

### *The Need to Avoid Unwarranted Sentencing Disparities*

As this Court well knows, this factor is often difficult to apply given the wide

variety of actions people undertake.

This Court, in deciding upon a sentence for Joanna Smith, considered several sentences imposed in "January 6" cases involving the destruction of property.

The great difference between this case and January 6 cases, however, is that one involved activities motivated by a desire to override the will of the people and interfere with the democratic process while the other sought to bring desperately needed change to a dangerously-heating world in order to save the lives of millions of people.

The government's sentencing memorandum does not cite any case that is comparable to Mr. Zepeda's, and there are likely very few, if any, that are directly on point.

The probation department referenced Joanna Smith's case, where she received a sentence of 60 days. Unlike Mr. Zepeda, however, she had no record. Also, unlike Mr. Zepeda, she seemed to delight in her "art" work near the Degas statue. Mr. Zepeda, on the other hand, is very remorseful, and mortified, that his actions caused Archives employees to spend so much time cleaning up what he did not think, at the time, was such a huge "mess." Had he known that it would take that much time and effort, cause fear in some of the employees at the time and shut down that part of the Archives for four days, he would have reconsidered his actions that day.

Probation also referenced two January 6 cases, but as undersigned counsel has already noted, the motivation in those cases was without merit while the cause for which Mr. Zepeda acted here could not be more meritorious, even if the way he went about

trying to advance it was criminal and likely counterproductive.

### *Conclusion*

Mr. Zepeda does deeply regret causing so much trouble to the Archives and its employees.

He cares deeply about our planet, and in his mind, he was getting off of the sidelines and actively attempting to bring about very-much needed good.

In the end, it has turned into a nightmare for him, as it was for the Archives that day. As a result, he had told counsel that he simply cannot engage in any illegal activities anymore, especially given his record of getting arrested at protests. It appears that his age, and perhaps maturity, have finally caught up to him.

One can certainly hope so.

The sentence the government recommends, aside from being one year greater than what it was going to recommend under a plea agreement, is excessive given all of the circumstances, including the defendant's motivation.

He never imagined the emotional impact his behavior would have on the employees of the Archives, or the hours that would be needed to remove all of the small paint specs from the casing and the floor. Now that he knows, he is saddened, and very sorry, that those were the consequences of his actions.

It apparently took a prosecution of this magnitude, in federal court, with these damages, to cause Mr. Zepeda to re-think his lifestyle completely. And again, while he will remain passionate about helping to address climate change, he no longer desires to

commit crimes and risk imprisonment to get his point across.

That is surely a good sign.  But were he ever tempted to re-engage in this type of behavior in the future, this Court will still have control over him, so to speak, for several years following his release from prison.

In light of all of this, he submits that a sentence of 12 months and a day in prison, followed by a period of supervised release, is sufficient to reflect the seriousness of his crimes and properly punish him therefor.

Respectfully submitted,

*Stephen F. Brennwald*

_____
Stephen F. Brennwald, Esq.
Bar No. 398319
Brennwald & Robertson, LLP
922 Pennsylvania Avenue, SE
Washington, D.C.  20003
(301) 928-7727
(202) 544-7626 (facsimile)
sfbrennwald@cs.com

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was sent by ECF, this 7th day of November, 2024, to all parties of record.

*Stephen F. Brennwald*

Stephen F. Brennwald

20